NOTICE

Decision filed 09/30/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200087-U

NO. 5-20-0087

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 04-CF-523 |
| | ) | |
| W.D. HOLLINGSWORTH, | ) | Honorable |
| | ) | Julie K. Katz, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not err in denying the defendant's motion for leave to file a successive postconviction petition, and any argument to the contrary would lack merit, and therefore the defendant's appointed appellate counsel is granted leave to withdraw, and the judgment of the circuit court is affirmed.

¶ 2   The defendant, W.D. Hollingsworth, pleaded guilty to felony murder and is serving his sentence of imprisonment for that charge. He appeals from the circuit court's order denying his motion for leave to file a successive postconviction petition. The defendant's appointed attorney on appeal, the Office of the State Appellate Defender (OSAD), has concluded that this appeal lacks merit, and on that basis, it has filed with this court a motion to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), along with a memorandum of law in support thereof. OSAD has provided the defendant with a copy of its *Finley* motion and memorandum, and the

1

defendant has filed with this court a written response thereto. This court has considered OSAD's motion and memorandum, the defendant's response, the entire record on appeal, and this court's decisions in the defendant's two previous appeals in this case. For the reasons that follow, this appeal does indeed lack merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.

¶ 3                              BACKGROUND

¶ 4                              The Charges

¶ 5    In 2004, the defendant and Derrick Holmes were jointly charged with (1) first degree murder (720 ILCS 5/9-1(a)(3) (West 2004)) and (2) home invasion (*id.* § 12-11(a)(2)), the latter of which is a Class X felony. It was alleged that on April 7, 2004, the two codefendants entered the dwelling place of Daniel Summers, knowing him to be present, and intentionally struck him about the head with a gun, thereby killing him, as they committed the forcible felony of residential burglary.

¶ 6                              The Plea of Guilty

¶ 7    In September 2006, the defendant, public defender Karen Craig, and a prosecutor appeared for a trial by jury. Just before the anticipated *voir dire*, the prosecutor announced the terms of a plea agreement, *viz.*: the defendant would plead guilty to count I, first degree murder; he would be sentenced to 23 years of imprisonment, with no good-time credit but with credit for time served, followed by 3 years of mandatory supervised release (MSR); and count II, which charged home invasion, would be dismissed. Attorney Craig and the defendant agreed that those were the terms of the plea agreement.

¶ 8    In response to queries from the court, the defendant stated that he was 46 years old, and he indicated that he understood the English language and was not under the influence of drugs or

2

alcohol. The court admonished the defendant that he had a right to be tried by a jury of 12 or by the judge alone; that he had a right to demand that the State prove his guilt beyond a reasonable doubt; and that he had a right to cross-examine the State's witnesses and to present his own witnesses, and to subpoena his witnesses if necessary. The defendant indicated his understanding of those rights and that, by pleading guilty, he would waive all those rights, and there would be no trial. "Finally," said the court, "you're giving up your Fifth Amendment Right to remain silent because you're admitting that you committed the offense stated in Count I. Do you understand that?" The defendant answered, "Yes, sir." The defendant indicated his understanding that murder is punishable by imprisonment for a term of 20 to 60 years, and that he would need to serve 100% of that time. He also understood that under the terms of the plea agreement, he would be sentenced to 23 years of imprisonment, and he would need to serve 100% of that time, and that his imprisonment would be followed by 3 years of MSR.

¶ 9    The prosecutor provided a factual basis for the plea. According to the prosecutor, 70-year-old Daniel Summers lived at a residence in East St. Louis, Illinois, on April 7, 2004. Summers had experienced a stroke that resulted in paralysis of his right side, and he suffered from hypertension, severe diabetes, and heart disease. At approximately 9 p.m., the defendant and codefendant Derrick Holmes broke a window in Summers's kitchen and entered his home without permission. They beat Summers with a gun, causing "at least two lacerations which caused [Summers] to bleed profusely." Two neighbors had observed the defendant and Holmes breaking the window, and they called 911. The police arrived and arrested the defendant and Holmes inside the residence. Paramedics removed Summers and took him to a local hospital, where he died on April 18, 2004. On April 19, 2004, Dr. Raj Nanduri, a forensic pathologist, performed an autopsy on Summers. She observed "the lacerations to the back of his head, a contusion to his brain in the

3

back of his head," and signs of "prior strokes and more recent strokes." Dr. Nanduri also examined Summers's medical records. Her conclusion, to a reasonable degree of certainty in her field, was that "the cause of death was the various preexisting conditions essentially overwhelming the victim once he was attacked in his home, that in fact was the catalyst that set in a chain of events that caused the death of the victim." After the prosecutor presented this factual basis, the court inquired of the defendant, "that's basically what happened, sir, is that correct?" The defendant answered, "Yes, sir."

¶ 10    When the court asked whether he pleaded guilty or not guilty to count I, murder, the defendant answered, "Guilty." Also, the defendant confirmed that the plea was his free and voluntary act, and that nobody had made any threats, or any promises other than the plea negotiations, to persuade him to plead guilty. The court found that the defendant understood his rights and waived them all by pleading guilty voluntarily, and it accepted the plea. The parties properly waived a presentence investigation report, and the court sentenced the defendant to 23 years in prison, to be followed by 3 years of MSR. The court admonished the defendant about his right to appeal, including the need for a written motion to withdraw the guilty plea, and the defendant indicated his understanding.

¶ 11                    The Motion to Withdraw Plea of Guilty

¶ 12    In October 2006, the defendant filed a *pro se* motion to withdraw guilty plea. In December 2006, the defendant filed an identical motion. In March 2007, the court allowed plea counsel Karen Craig to withdraw from the case. It appointed P.K. Johnson IV as postplea counsel for the defendant.

¶ 13    In August 2007, postplea counsel Johnson filed, on behalf of the defendant, an amended motion to withdraw guilty plea. In the amended motion, the defendant claimed that (1) his plea of

4

guilty was involuntary (i) because the circuit court did not properly admonish him as to his rights, and (ii) the defendant "was under a great deal of pressure and was not thinking clearly" at the time he entered his plea; and (2) his plea counsel provided ineffective assistance for various specified reasons. (See the summary of the testimony presented at the evidentiary hearing, *infra*.) Postplea counsel Johnson also filed a certificate of compliance with Illinois Supreme Court Rule 604(d) (eff. July 1, 2006).

¶ 14    In December 2007, the circuit court held a hearing on the defendant's amended motion to withdraw guilty plea. Two witnesses testified—the defendant, for himself, and plea counsel Karen Craig, for the State.

¶ 15    The defendant testified that although he had an attorney, Karen Craig, for the plea of guilty, he "did not want to go to trial with" her and "tried everything in [his] power" to have her removed from the case, but nobody would listen to him. Ultimately, he pleaded guilty, but he did not know what he was doing. He had told Craig "several times" that he wanted to go to trial, but she said that he could be sentenced "up to a hundred years for this situation" and therefore "it would be best for [him] to go ahead and just take the plea." The defendant truly believed that he could get more time if he did not take the plea, just as Craig had said. If she had not said that, he never would have accepted the plea offer. She effectively coerced him into pleading guilty. Before the plea date, the defendant wrote to Craig asking for a list of the witnesses who would be testifying against him, but she did not present such a list to him. The defendant wrote to Craig "several times" asking her to come to the jail and discuss the case, but "she never showed up." The defendant did see Craig "plenty of times" when he was brought over for court appearances, but he never had a chance for substantive discussions with her. The defendant believed that the decedent, who died 10 or 12 days after the break-in, died from ailments other than the injuries suffered during

5

the break-in, and he wanted an expert witness to assist him in establishing that. On the date scheduled for trial, the expert had been subpoenaed and was supposed to appear, but Craig merely told the defendant that the expert was not present. Craig did not mention why the expert was not present, or whether he would be present. This concerned the defendant deeply, since the cause of death was crucial in the defendant's case. It was one of the reasons he pleaded guilty.

¶ 16 Karen Craig testified that she had been an assistant public defender in St. Clair County for 20 years and had represented numerous people charged with first degree murder. Craig reviewed with the defendant the evidence against him, and she interviewed the defendant sufficiently to defend the case. The cause of Daniel Summers's death would be a key issue at the defendant's trial, and therefore Craig arranged for Dr. Daniel J. Spitz, a pathologist from Michigan, to testify as an expert at the defendant's trial. Dr. Spitz would testify that the blows to Summers's head were not, in fact, the cause of his death. Craig informed the defendant of Dr. Spitz's helpful opinion. At some point during the pendency of the case, the State made an initial offer that included capping the defendant's sentence for murder at 40 years. On the day set for jury trial in the case, Craig was "[a]bsolutely" prepared for trial. Before the prospective jurors were brought into the courtroom, and at the request of the defendant, Craig proposed to the prosecutor that the defendant plead guilty to murder alone and be sentenced to imprisonment for 23 years. Craig and the prosecutor agreed to that disposition. The defendant accepted the plea offer. It was the defendant's decision to plead guilty, according to Craig, and she did not force him to plead guilty.

¶ 17 After hearing the arguments of counsel, the circuit court found that attorney Craig was "ready to go to trial" on the trial date, the defendant was fully admonished as to his rights, and the defendant pleaded guilty knowingly and voluntarily. Accordingly, the court denied the amended

6

motion to withdraw guilty plea. The defendant appealed, and the circuit court appointed OSAD to represent him in the direct appeal.

¶ 18    The defendant's sole argument to this court was that postplea counsel's certificate of compliance with Supreme Court Rule 604(d) was defective for various reasons. This court rejected his argument and affirmed the circuit court. *People v. Hollingsworth*, No. 5-08-0012 (2009) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 19                        The Defendant's Initial Postconviction Petition

¶ 20    In May 2012, the defendant filed a *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2012)). He claimed that plea counsel and direct-appeal counsel provided constitutionally ineffective assistance, and that the circuit court deprived him of his sixth amendment and fourteenth amendment rights when it denied, without a hearing, his motion for the appointment of counsel other than the public defender. The circuit court found that the defendant had stated the gist of a constitutional claim, and it appointed postconviction counsel James P. Stiehl for the defendant. In January 2014, the defendant filed a *pro se* "petition for leave to file supplement [*sic*] petition," seeking to add a claim to his postconviction petition.

¶ 21    In June 2015, the defendant, through postconviction counsel Stiehl, filed an amended postconviction petition. He alleged that the medical evidence in the case made it "virtually inconceivable that a jury could have found beyond a reasonable doubt the cause of [Summers's] death to have been the trauma allegedly inflicted by [the defendant]." According to the defendant, defense counsel did not share with him any of this medical evidence. Furthermore, counsel did not have Dr. Daniel J. Spitz, a forensic pathologist who defense counsel had hired, prepare a written report on the cause of Summers's death. As a consequence of defense counsel's failure to properly prepare for trial, the defendant was forced to accept the State's plea offer.

7

¶ 22    Attached to the amended petition were several reports written by physicians at Kenneth Hall Regional Hospital, the hospital where Summers was treated from the day he was beaten about the head until the day he died. Also attached were an autopsy report on Summers prepared by Dr. Raj Nanduri, and a four-page letter from Dr. Daniel J. Spitz to postconviction counsel Stiehl, dated October 22, 2014. In her autopsy report, Dr. Nanduri concluded that "[t]he manner of death is classifiable as homicide." In his four-page letter to Stiehl, Dr. Spitz stated, *inter alia*, that "[w]hile it is clear that Mr. Summers was admitted to the hospital following injuries sustained during an alleged assault, the stroke that resulted in his death occurred while he was in the hospital and was unrelated to his injuries." To a reasonable degree of medical certainty, Dr. Spitz stated that the cause of death was "best certified as Cerebral Infarction and Pneumonia Complicated by Arteriosclerotic Hypertensive Cardiovascular Disease." There was "no direct cause and effect relationship between the trauma and the death," and "the scalp lacerations [which were caused by the trauma] were essentially healed and did not play a causative or contributory role in his death."

¶ 23    The State filed a motion to dismiss the amended petition. The State argued that the petition was untimely, and its claims were both forfeited and without merit.

¶ 24    In August 2015, the defendant, through postconviction counsel Stiehl, filed an "amendment to amended petition for postconviction relief." *Inter alia*, he asserted a claim of actual innocence, based on the fact that Summers's death "was not a homicide." The State filed an amended motion to dismiss, but the court denied the motion.

¶ 25    In February 2016, the court held an evidentiary hearing on the defendant's amended postconviction petition, and on the amendment thereto. The parties stipulated to the autopsy report by Dr. Nanduri and the letter from Dr. Spitz, as well as the medical records of Summers from the

date of the assault to the date of his death. After hearing argument, the court took the matter under advisement.

¶ 26 In April 2016, the court, in a written order, denied the defendant's amended postconviction petition. The court found that the defendant had failed to prove the substantial denial of any federal or state constitutional right, and also found that his claim of actual innocence had failed. The defendant filed a notice of appeal from the denial order. The court appointed OSAD as his appellate counsel.

¶ 27 On appeal, the defendant argued that he had received ineffective assistance of counsel prior to his guilty plea. (He did not argue a claim of actual innocence.) In May 2019, this court affirmed the order denying the postconviction petition. *People v. Hollingsworth*, 2019 IL App (5th) 160195-U.

¶ 28 The Defendant's Motion for Leave to File a Successive Petition

¶ 29 In September 2016, the defendant filed a *pro se* motion for leave to file a successive postconviction petition. The defendant asserted that he was "raising new claims that were not raised in the first petition" because they were "previously unavailable due to the deceptive practice of defense counsel working with the prosecution to conceal exculpatory evidence and favorable witnesses in favor of deceiving [the defendant] to make a known to be false incriminating statement needed to support a guilty plea to murder." The defendant also asserted that "newly discovered evidence established his actual innocence and actual prejudice from deceptively concealing exculpatory evidence, which is an error that worked to [the defendant's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." The motion was barely more than a page; its key portions have been quoted in full.

¶ 30    Several documents were attached to the motion for leave to file a successive petition. These documents were (1) approximately 24 pages of transcript from the guilty-plea hearing held in September 2006; (2) a copy of the circuit court's April 2016 order denying the defendant's first postconviction petition; (3) a copy of Dr. Spitz's four-page letter to attorney Stiehl, dated October 22, 2014, wherein he described his involvement with this case, summarized medical information relating to the last days and death of Daniel Summers, and stated his opinion that Summers had died as the result of a stroke, and not from blunt force head injuries, which were "of minor severity"; (4) a sworn affidavit, dated September 13, 2016, from Matthew Martin, an inmate at Pinckneyville Correctional Center, wherein Martin stated that in September 2006, he learned of the instant case from media or from a conversation with some person, then found the name and phone number of attorney Karen Craig, and asked her "if [he] could be a defense witness to give [his] opinion" that the cause of Summers's death could not have been "two small and healed scalp wounds" but rather it was due to Summers's preexisting conditions, and that a grave injustice was being done to the defendant, a black man, in prosecuting him for murder, however, Martin was subsequently informed that the defendant would plead guilty in the case; (5) a sworn affidavit, dated September 13, 2016, from Eugene Horton, a paralegal at Pinckneyville Correctional Center, wherein Horton stated that in May 2016, the defendant asked him for help in preparing a successive postconviction petition, and Horton further stated that he would be willing to testify that in St. Clair County, he had noticed that certain white defense counsel, including Karen Craig, had "a secret relationship" with prosecutors, including the one in the defendant's case, pursuant to which they would suppress "exculpatory evidence" and refuse to conduct "reasonable investigations," all for the purpose of "unlawfully convict[ing] blacks"; (6) un unsworn affidavit from Dr. Spitz stating that he wrote a report, dated October 22, 2014, for the instant case at the request of postconviction

10

counsel Stiehl, and that all of the information in that report was true to the best of his knowledge; and (7) a sheet of paper bearing the notarized signature of the defendant, and almost nothing else.

¶ 31 The defendant also submitted the proposed successive petition itself, which was verified. It claimed that (1) the defendant was actually innocent of the murder, and (2) his plea counsel provided ineffective assistance. In support of the actual-innocence claim, the defendant cited "newly discovered evidence" in the form of (i) the affidavit of inmate Matthew Martin regarding the cause of Summers's death, and (ii) the medical opinion of Dr. Spitz regarding the cause of Summers's death, as contained in his four-page letter to postconviction counsel Stiehl, dated October 22, 2014. In support of the ineffective-assistance claim, the defendant (i) stated that attorney Craig told him, one day prior to his plea of guilty, that unless he admitted that his "infliction of two small scalp wounds" had caused Summers's death, he would be sentenced to imprisonment for 100 years; (ii) stated that Craig, prior to the guilty-plea hearing, had information —specifically Dr. Spitz's opinion as to the cause of death, and the reasoning of inmates Martin and Horton—that showed "the impossibility" that the two scalp wounds, which had "healed," had caused Summers's death; (iii) stated that Craig had declined to conduct a reasonable investigation of the case or to procure exculpatory witnesses; (iv) stated that Craig informed inmates Martin and Horton that their testimony would not be needed, even though they both had explained that "it was impossible for the cause of death to be from healed head wounds"; and (v) stated that Craig conspired with the assistant state's attorney to "deliberately elicit" from the defendant, at the guilty-plea hearing, his admission that "two scalp wounds he inflicted caused the death of the victim."

¶ 32 In October 2016, the defendant filed, for reasons unknown, another successive petition for postconviction relief that was essentially the same as the one filed in September 2016.

11

¶ 33    Years passed.  No ruling was made on the motion for leave to file a successive petition.

¶ 34    In February 2020, the circuit court received a letter from the defendant, calling attention to this lack of a ruling.  The defendant also submitted a new "Successive Petition for Post-Conviction Relief."  (While the defendant submitted a new successive petition, he did not file a new motion for leave to file it.  The motion that he filed in September 2016 was the only such motion he ever filed.)  In the body of the new petition, the defendant stated that he was "resubmitting an amended petition of Successive Post-Conviction Relief."  In the new petition, the defendant claimed that his plea of guilty was unknowing and involuntary due to his misapprehension of the facts and the "misrepresentations" of plea counsel Karen Craig and the prosecutor.  The defendant drew attention to the autopsy report on decedent Summers, noting the report's conclusion that head trauma was the cause of death and that the death was classifiable as a homicide.  According to the defendant, counsel Craig simply accepted this conclusion from the autopsy report, without any independent investigation.  She told the defendant that Summers's head trauma was so severe that it was "the sole cause" of Summers's death, and that if the defendant went to trial and was found guilty, he would "most likely" be sentenced to natural life imprisonment.  "Those circumstances where [*sic*] simply not the case."  Counsel Craig's certainty about the cause of death, the defendant maintained, was also contradicted by Summers's medical records from his last days; they showed that head trauma "was no direct cause for his death."  Craig should have discussed these medical records and "conveyed to him what this meant."  (The new petition did not mention Dr. Spitz or his own conclusions.)  The sole attachment to this new petition was the autopsy report on Summers.

¶ 35    On February 11, 2020, the circuit court entered an order in this cause.  First, the court noted that the September 2016 motion for leave to file a successive postconviction petition had never been ruled on.  Next, the court stated that it would consider the September 2016 motion for leave

12

to file a successive postconviction petition "in conjunction with" the February 2020 postconviction petition. According to the court, the successive postconviction petition that was submitted in February 2020 presented "essentially the same arguments" as the successive postconviction petition that was submitted in September 2016, and "more importantly," it presented "the same arguments" that the defendant made to the circuit court in the evidentiary hearing that was held in February 2016. On the grounds of *res judicata* and waiver, the court denied the motion for leave to file a successive postconviction petition.

¶ 36    The defendant perfected an appeal from the denial order. The circuit court appointed OSAD to represent him on appeal.

¶ 37                              ANALYSIS

¶ 38    This appeal is from an order denying the defendant's motion for leave to file a successive petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). Appellate review of such an order is *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39. This court may affirm on any ground of record. *People v. Johnson*, 208 Ill. 2d 118, 129 (2003).

¶ 39    As previously noted, the defendant's appointed appellate attorney, OSAD, has filed a *Finley* motion to withdraw as counsel. In its memorandum in support of the *Finley* motion, OSAD reviews the contents of the defendant's motion for leave, which was filed in September 2016, and the claims that he sought to present to the circuit court in his successive postconviction petition, submitted in February 2020. OSAD concludes that the circuit court did not err in denying the motion for leave, and this court agrees.

¶ 40    The Act provides a method by which any person imprisoned in the penitentiary may assert that his conviction resulted from a substantial violation of his federal or state constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2016). A proceeding under the Act is a collateral proceeding, not

13

an appeal from the underlying judgment of conviction. *People v. English*, 2013 IL 112890, ¶ 21. Therefore, a postconviction proceeding "allows inquiry only into constitutional issues that were not, and could not have been, adjudicated on direct appeal." *People v. Pitsonbarger*, 205 Ill. 2d 444, 455-56 (2002). Issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*, while issues that could have been raised on direct appeal, but were not, are considered waived. *Id.* at 456. In the postconviction context, waiver is "better referred to as 'forfeiture.'" *People v. Daniel*, 379 Ill. App. 3d 748, 749 (2008).

¶ 41 A postconviction proceeding commences with the filing of a petition in the circuit court. 725 ILCS 5/122-1(b) (West 2016). Generally, the Act permits a defendant to file only one petition for postconviction relief, unless he has obtained leave of court to do so. *Id.* § 122-1(f). Leave of court will be granted (1) if the defendant meets the cause-and-prejudice test, or (2) if he shows a colorable claim of actual innocence based on evidence that is newly discovered, material, and not merely cumulative, and of such a conclusive character that it would likely change the result on retrial. *People v. Edwards*, 2012 IL 111711, ¶¶ 23-24, 32; *Pitsonbarger*, 205 Ill. 2d at 459.

¶ 42 The cause-and-prejudice test consists of demonstrating cause for the defendant's failure to bring the claim in his initial postconviction proceeding, and prejudice resulted from that failure. 725 ILCS 5/122-1(f) (West 2016). The defendant shows cause "by identifying an objective factor that impeded his or her ability to raise a specific claim" in the initial postconviction proceeding; he shows prejudice "by demonstrating that the claim not raised" in the initial postconviction proceeding "so infected the trial that the resulting conviction or sentence violated due process." *Id.* The defendant must satisfy both elements of the cause-and-prejudice test—that is, he must show both cause and prejudice—to win the right to file a successive postconviction petition. *Pitsonbarger*, 205 Ill. 2d at 464. Only a *prima facie* showing is needed. *People v. Bailey*, 2017

14

IL 121450, ¶ 24. The cause-and-prejudice test must be applied to each individual claim raised by the defendant. *Pitsonbarger*, 205 Ill. 2d at 462. Leave to file a successive petition will be denied only where "it is clear, from a review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 43 Furthermore, collateral estoppel (issue preclusion) bars the consideration of an issue in a successive postconviction proceeding if the identical issue was decided in a prior postconviction proceeding. *People v. Tenner*, 206 Ill. 2d 381, 396 (2002). In deciding whether the issue in the successive petition is the identical issue as the one decided in the prior postconviction proceeding, courts are guided by the thought that a petitioner is not allowed to present "piecemeal post-conviction litigation" in successive petitions. *Id.* at 398; *People v. Williams*, 392 Ill. App. 3d 359, 368 (2009).

¶ 44 The defendant's September 2016 motion for leave to file a successive petition, with its several attachments, and his successive petition submitted in February 2020, all of which are the focus of this appeal, presented allegations about plea counsel that were substantially identical to the claims previously litigated during postplea proceedings in December 2007 and during the initial postconviction proceeding. At each of those three points in this case, the defendant alleged that plea counsel had provided ineffective assistance by failing to develop medical evidence to establish that the blows to Summers's head did not cause Summers's death. Since the specific allegations were raised before, or could have been raised before, they are barred from consideration now, whether by collateral estoppel, *res judicata*, or forfeiture. The defendant cannot continue,

15

*ad infinitum*, to assert that plea counsel failed to develop medical evidence relating to Summers's cause of death.

¶ 45    As for the defendant's claim of actual innocence of Summers's murder, the defendant did not present a colorable claim of actual innocence based on evidence that is newly discovered, material, and not merely cumulative, and of such a conclusive character that it would likely change the result on retrial. He seems to have invoked the phrase "actual innocence" solely as a way of evading the Act's restriction of defendants to only one postconviction petition. He used it in a strictly talismanic fashion. As OSAD states in the memorandum in support of its *Finley* motion, "Although [the defendant] asserts actual innocence, the substance of his claims more clearly relate[s] to allegations that his plea counsel was ineffective for failing to investigate the cause of Summers's death and communicate the results of her findings to [the defendant]."

¶ 46                                    CONCLUSION

¶ 47    The circuit court did not err in denying the defendant's motion for leave to file a successive petition. Any argument to the contrary would lack substantial merit. Therefore, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court is affirmed.


¶ 48    Motion granted; judgment affirmed.

16